IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>vs.<br><br>MICHAEL JOSEPH OWENS,<br><br>                              Defendant. | CR 22-144-BLG-SPW<br><br><br>ORDER |

Before the Court is a Motion to Suppress filed by Defendant Michael Joseph Owens. (Doc. 44). Defendant seeks to suppress all evidence seized from his car during the traffic stop on the grounds that law enforcement lacked reasonable suspicion to pull the car over, and that law enforcement lacked probable cause to arrest and subsequently search him. (Doc. 45). The United States opposes the motion. (Doc. 48). On July 24, 2023, the Court held a hearing on the matter, during which Montana Highway Patrol Trooper Matthew Hudgins, Montana Division of Criminal Investigation ("MDCI") Agent Adam Miller, and MDCI Agent Kati Stewart testified. (Doc. 59). Considering the parties' briefing and the testimony and evidence presented at the hearing, the Court denies Defendant's motion.

1

## I.   Factual Background[1]

### A.   Investigation

On October 11, 2022, Agent Stewart executed a search warrant pursuant to a drug investigation on a home in Billings. (Doc. 49-3 at 4). Meghan Pedigo was the only occupant of the home and admitted to having 800 fentanyl pills in her closet that she received the day before. (*Id.*). She identified her source of the pills as a mixed-race male named Mike who is about 45 years old and drives a white Kia SUV with dark windows. (*Id.*). She said Mike lives in Denver and has sold her pills multiple times. (*Id.*). Pedigo provided Agent Stewart with two phone numbers for him. (*Id.*). Pedigo also showed Agent Stewart her texts with Mike, which, based on Agent Stewart's training and experience, indicated that Mike was selling drugs to Pedigo. (*Id.* at 2).

Agent Stewart identified "Mike" through law enforcement databases and open-source methods as Michael Owens. (Doc. 49-1 at 1). Pedigo's Child Protective Services caseworker called Agent Stewart later to notify her that Pedigo identified Mike as Michael Owens. (*Id.*). Agent Stewart applied for and was granted a search warrant to install a tracer device on Defendant's phone. (*Id.* at 2; Doc. 49-3). The tracer pinged in, among other locations, Aurora, Colorado on

---

[1] The facts are based on the dash camera footage from Trooper Hudgins's patrol car (Doc. 50); the reports of Agents Stewart and Miller and Trooper Hudgins, (Docs. 48-1, 49-1, 49-2); the search warrants (Docs. 49-3, 49-4, 49-5, 49-6, 49-7, 49-8); the testimony of Agent Stewart, Agent Miller, and Trooper Hudgins (Doc. 59); and the parties' briefing (Docs. 45, 48, 51).

October 28, 2022; in Casper, Wyoming on October 29; and in Billings, Montana from October 29 to November 3. (Doc. 49-1 at 2).

Agent Stewart also was granted a search warrant to use a cellular site simulator to help narrow the location of the phone pings. (*Id.* at 2-3; Docs 49-4, 49-5). On November 7, the simulator placed Defendant's phone at the Best Western Plus Clocktower Inn in Billings. (Doc. 49-1 at 3). Hotel records listed Defendant in room 187. (*Id.*). Agent Stewart later observed a man in the Clocktower Inn parking lot who matched the description of Defendant place a bag in the back of a silver Chevrolet Equinox with a Colorado temporary tag. (*Id.*). The vehicle was registered to a Crystal Angela Gutierrez of Aurora, Colorado. (*Id.*).

Agent Stewart was granted a warrant to place a tracker on the Equinox. (Doc. 49-6). On November 10, Agent Stewart located the Equinox at a La Quinta Inn in Billings and placed the tracking device on it. (Doc. 49-1 at 3).

Later that day, Agent Miller notified Agent Stewart about information he had learned while executing a search warrant at a Days Inn in Billings pursuant to a drug investigation. (Doc. 49-2 at 1). Agent Miller told Agent Stewart that he had interviewed the occupants, Marcus Arthur Hanson and Breanna Dee Johannesen, each separately in their vehicle. (*Id.*). Hanson and Johannesen independently told Agent Miller that they procured one pound of

3

methamphetamine and 1,000 fentanyl pills from a female they knew as "Nikki" from Colorado at the La Quinta Inn in Casper. (*Id.* at 2). Hanson said Nikki had a newer silver Chevrolet SUV. (*Id.*). Messages on Johannesen's cell phone corroborated the information the pair had provided. (*Id.*). Agent Miller testified that "Nikki" was slang for Gutierrez's middle name, Nichole.

The Casper La Quinta Inn staff confirmed that a Crystal Angela Nichole Gutierrez checked in on Saturday, October 1, 2022, and listed a silver Chevrolet Equinox as her vehicle. (*Id.*). Staff told Agent Miller that Gutierrez stays at the hotel once a month or more and provided her phone number. (*Id.* at 3). The phone number was traced to Gutierrez with an Aurora, Colorado address. (*Id.*). Staff also provided Agent Miller with surveillance footage showing Gutierrez and her vehicle at the hotel. (*Id.* at 2). Hanson identified the female in the footage as Nikki and the silver Chevrolet Equinox as Nikki's vehicle. (*Id.* at 3).

Agent Stewart testified that, at this point, her and Agent Miller had connected the dots between Gutierrez and Defendant, given the overlap between their travel routes, their use of the Equinox, and their involvement in drug distribution. Agent Miller then was granted a search warrant for the installation of a tracer device on Gutierrez's phone. (Doc. 49-7).

B.    *Traffic Stop*

On November 21, 2022, Defendant's and Gutierrez's phones were pinging near Casper. (Doc. 49-1 at 4). The GPS tracker showed the Equinox in Aurora. (*Id.*). Defendant's phone eventually stopped pinging, but Gutierrez's phone began traveling north to Montana. (*Id.*) Agent Miller saw a white Kia Sportage that matched Pedigo's description of Defendant's vehicle near Wyola, Montana. (*Id.*). Agent Miller testified that he could not initially see the number on the vehicle's temporary tag, so he had to pull up alongside the Kia and match its speed to read it.

Agent Miller called Trooper Hudgins and asked him to pull over a white Kia Sportage driving west on Interstate 90. (Doc. 48-1 at 5). Trooper Hudgins saw the Kia at milemarker 468 and pulled onto the interstate. (*Id.*). Trooper Hudgins reported that the temporary tag was "unreadable" when he was traveling about 150 feet away—what he considered a safe distance for their speed. (Doc. 48-1 at 5).

He stopped the vehicle at milemarker 458. He stated in his report and at the hearing that the vehicle did not pull over immediately, though it also was not trying to speed up or drive away. (Doc. 48-1 at 5). He also testified that he was able to read the temporary tag only once they slowed down and he got closer to the Kia's rear end, about 30 to 45 feet away.

Trooper Hudgins approached the driver door, but the driver, later identified as Gutierrez, only rolled down the window a few inches. (Doc. 48-1 at 5; Doc 50

at 1:15). Trooper Hudgins asked her to roll it down more, but Gutierrez only rolled

it down another inch. (Doc. 48-1 at 5; Doc. 50 at 1:23-25). Trooper Hudgins

asked her to roll it all the way down. Trooper Hudgins wrote in his report that this

behavior indicated to him "that they could be involved in criminal activity as

criminals will often avoid rolling their windows down to keep officers from seeing

contraband in the vehicle." (Doc. 48-1 at 5). He also testified that this behavior

made him suspect Gutierrez might try to flee.

Gutierrez eventually rolled down her window, and Trooper Hudgins told her

and the passenger, later identified as Defendant, that he stopped them because he

could not read the car's tag. (Doc. 48-1 at 5; Doc. 50 at 1:28-35). Defendant

explained he owned the car and that he had put tape over the tag to prevent people

from stealing it. (Doc. 48-1 at 5). He handed Trooper Hudgins his license and

registration. (*Id.*). Gutierrez also gave him her license. (*Id.*). Trooper Hudgins

asked Gutierrez twice if she would sit in his car in case he had trouble verifying

her information. (*Id.*; Doc. 50 at 5:00-57). She refused. (Doc. 48-1 at 5).

Trooper Hudgins returned to his vehicle and ran the tag number. He got no

return. (Doc. 50 at 8:45). He also called Agent Miller to take over. (*Id.* at 7:15-

18). Agent Miller, Agent Stewart, Laurel Police Officer Jackson Booth and his

K9, Trooper Logan Bartholomew, Trooper Jared Delaney, and other law

enforcement arrived shortly after. (Doc. 48-1 at 5). Trooper Delaney set a spike strip in front of the rear passenger tire. (Doc. 50 at 11:56).

Agent Miller approached the driver's side and told Gutierrez and Defendant that they were the subjects of a drug investigation. (Doc. 50 at 17:30). He repeatedly asked Gutierrez to turn off the car and step out so he could speak with her in a safe location. (*Id*. at 17:40-18:40). Officer Booth also was not comfortable running his dog around the car without her turning it off and exiting the vehicle. (Doc. 49-2 at 4). Gutierrez did not comply. She asked Agent Miller "what this was all about" and told him they had done nothing wrong. (*Id*.). Agent Miller reported that she "seemed incredibly nervous and was reluctant to make eye contact ... or engage with him in conversation; instead was looking ahead at the highway and over at [Defendant]." (*Id*. at 4-5). Agent Miller wrote that his training and experience indicated to him that she was engaging in her "'fight or flight' response, and attempting to formulate a plan of action." (*Id*. at 5).

Agent Stewart tried to remove Defendant, but he shut the door on her. (Doc. 50 at 19:07-10). Meanwhile, Trooper Hudgins opened the driver door and tried to remove Gutierrez. (Doc. 48-1 at 6; Doc. 50 at 19:06-11). She pushed Trooper Hudgins away, put the vehicle in drive, and sped off down the interstate. (Doc. 48-1 at 6; Doc. 50 at 19:11-20). As she drove away, she ran over the spike strip with one of the rear tires. (Doc. 50 at 19:17).

Gutierrez proceeded to flee from the officers for about 25 miles, at speeds up to 120 mph, with only three functional tires. (*Id.*). Gutierrez eventually lost control of the vehicle as she approached a 90-degree curve on Fly Creek Road south of Pompeys Pillar. (Doc. 48-1 at 6). Officers commanded Gutierrez and Defendant out of the vehicle and arrested them. (Doc. 50 at 35:43-40:08).

Officers searched Defendant's person and found a bag of white powder, a bag of blue pills, and cash. (Doc. 49-1 at 4). Agent Stewart also saw a firearm in the door of the passenger seat. (*Id.*). Trooper Hudgins looked through the window of the car and saw loose blue pills and large rocks that looked like methamphetamine. (Doc. 48-1 at 7). The Kia was impounded, and Agent Stewart applied for a warrant to search the Kia. (*Id.* at 4-5).

Thirteenth Judicial District Judge Colette Davies granted the search warrant application. (Doc. 49-8). Inside the vehicle, agents located methamphetamine, fentanyl pills, a loaded firearm, and $5,140 in cash and pre-paid debit and credit cards. (Doc. 49-1 at 5). Defendant was then charged in this Court with conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846, possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Doc. 10).

8

## II.    Legal Standard

### A.    *Traffic Stop*

The Fourth Amendment prohibits unreasonable searches and seizures.  A traffic stop is a "seizure" within the meaning of the Fourth Amendment. *Heien v. North Carolina*, 574 U.S. 54, 60 (2014).  Similar to a *Terry* stop, law enforcement only needs reasonable suspicion that a crime has occurred to conduct an investigatory stop. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). "Reasonable suspicion is defined as 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (quoting *United States v. Cortez,*499 U.S. 411, 417-18 (1981)).  Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct. *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000).  "The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence and less than probable cause." *United States v. Tiong*, 224 F.3d 1136, 1140 (9th Cir. 2000).

In determining whether reasonable suspicion exists, the underlying facts are considered in their totality and in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  The facts justifying a stop must be "known to officers" at the time of the search or stop. *Id.* (citations omitted).

If law enforcement violated Defendant's Fourth Amendment right to be free from "unreasonable searches and seizures" during the traffic stop, "then all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

B.    *Warrantless Arrest and Search*

Under the Fourth Amendment, a warrantless arrest requires probable cause that the person has committed a crime. *United States v. Watson*, 423 U.S. 411 (1976) (warrantless arrest). The Fourth Amendment also prohibits searches without a warrant. *Flippo v. West Virginia*, 528 US. 11, 13 (1999). However, law enforcement can search a person without a warrant if the search is incident to the person's arrest. *Chimel v. California*, 395 U.S. 752, 762-63 (1969).

"Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Accordingly, to satisfy the probable cause requirement, there must be a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Needham*, 718 F.3d 1190, 1194 (9th Cir. 2013). Like in a reasonable suspicion analysis, the underlying facts are considered in their totality

and in light of the officer's experience. *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2022).

If law enforcement violated Defendant's Fourth Amendment right to be free from "unreasonable searches and seizures" by arresting and searching him without probable cause, "then all evidence seized as a result of the stop must be suppressed as the fruit of the poisonous tree." *Morales*, 252 F.3d at 1073 (citing *Wong Sun*, 371 U.S. at 484-85).

## III.   Analysis

### A.   *Traffic Stop*

Defendant argues that the initial traffic stop violated his Fourth Amendment rights because the basis for the stop was pretextual. (Doc. 45 at 4). Defendant maintains that law enforcement manufactured an alleged traffic violation—driving with an obstructed temporary registration tag—in order investigate the drug crimes because the evidence shows that Agent Miller could read the tag and reported the number to Trooper Hudgins prior to the stop. (*Id.* at 6). That Agent Miller could read the tag—and thus it was not obstructed—renders the stop pretextual and in violation of Defendant's Fourth Amendment rights. (*Id.*).

Defendant further asserts that the ongoing drug investigation "does not cure the issue of the stop being pretextual" based on the Ninth Circuit's decision in *United States v. Orozco*, 858 F.3d 1204 (9th Cir. 2014). (Doc. 51 at 4). Defendant

asserts that *Orozco* prohibits stops that would not have been made but for a tip related to a drug investigation because such stops are pretextual. (*Id.* at 5). Since here, "[t]he circumstances around the stop show that it was not initiated due to any issue with the temporary registration tag" but rather "so the officers could conduct a drug investigation, the stop was pretextual and thus illegal." (*Id.* at 6).

The Government disagrees, arguing that the stop was not pretextual because not only was the tag obstructed in a way that violated Montana law but also the underlying drug investigation provided officers with independent reasonable suspicion to pull Defendant over. (Doc. 48 at 17-21). Further, since the Ninth Circuit has held that officers can rely solely on reasonable suspicion of criminal activity independent of any traffic violations to justify a traffic stop, whether reasonable suspicion based on the obstructed tag existed is irrelevant. (*Id.* at 17 (citing *United States v. Magallon-Lopez*, 817 F.3d 671 (9th Cir. 2016))).

The Court will first clarify the applicable law on pretextual stops. The Court then will address whether Trooper Hudgins had reasonable suspicion to effectuate the stop on the basis of either the traffic offense or the drug investigation.

### 1.    *Pretextual Stops*

If particularized facts provide reasonable suspicion to justify a traffic stop, "the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *Magallon-Lopez*, 817 F.3d at 675 (citing

*Whren v. United States*, 517 U.S. 806, 812-13 (1996)). The analysis does not turn on "whether the officer is truthful about the reason for the stop." *Id.*

Here, if reasonable suspicion existed based on the drug investigation, Trooper Hudgins could have lawfully stopped Defendant regardless of whether he had reasonable suspicion of a traffic violation based on the obscured temporary tag. *Orozco*'s holding that the Court must consider the officer's actual motivation in making a traffic stop is not applicable because *Orozaco* concerns administrative searches, where "actual motivations *do* matter." 858 F.3d at 1210 (emphasis in original) (internal citations and quotation marks omitted). Since the stop here was not pursuant to an administrative scheme, *Orozco* is not controlling. *See United States v. Ortiz*, No. 5:14-cr-28-EJD, 2018 WL 3208154, at *5 (N.D. Cal. June 29, 2018) (distinguishing *Orozco*). *Orozco* also assumed there was no reasonable suspicion for the stop because the Government had waived the argument. 858 F.3d at 1210. Here, whether reasonable suspicion for the stop existed is central to the constitutionality of the stop.

Even if *Orozco* did apply, it expressly recognized that a dual motive—"one valid, and one impermissible"—in pulling someone over "does not render [a stop] pretextual." *Id.* at 1213. Here, the Government alleges that a dual purpose existed—to investigate a traffic violation and illegal drug activity—so if

reasonable suspicion exists for only one purpose, the stop still would not violate the Fourth Amendment. *Ortiz*, 2018 WL 3208154, at *5.

    2.   *Drug Investigation*

Moving to whether reasonable suspicion based on the drug investigation existed to justify the stop, the Government contends that "[t]he reasonable suspicion of Gutierrez and [Defendant's] drug trafficking is beyond dispute." (Doc. 48 at 17). Supporting reasonable suspicion, according to the Government, is the independent, first-hand information given to law enforcement by three informants that supported the five search warrants issued for their phones and the tracker on Gutierrez's Equinox. (*Id.* at 18). Defendant does not rebut the Government's evidence supporting reasonable suspicion and instead relies on *Orozco* to argue that the drug investigation is not relevant. (Doc. 51 at 4-6).

The Court agrees with the Government that the drug investigation provided independent reasonable suspicion to justify the stop. Information from Pedigo and subsequent investigations showed that a mixed-race man in his mid-40s named Michael Owens lives in the Denver area and has come to Billings to sell Pedigo drugs. Further, Michael Owens drives a Kia SUV with dark windows and has a criminal record of possession with intent to distribute. Agent Stewart also confirmed Defendant was in Billings and using the Equinox registered to Gutierrez.

14

Agent Miller's investigation confirmed through two informants that Gutierrez had sold methamphetamine and fentanyl in Casper. Defendant's phone pings placed him and Gutierrez's Equinox in Casper two days later, further indicating that the pair may be working together. On the day of the instant incident, both Gutierrez's and Defendant's phones showed them together in Casper and, after Defendant's phone stopped pinging, Gutierrez traveling toward Montana. Gutierrez's car was in Colorado, according to the tracker; however, officers located a Kia SUV in southern Montana matching the description of Defendant's vehicle provided by Pedigo. Given the pair's phone pings that day and the officers' knowledge that Defendant drove a matching vehicle, the officers had reasonable suspicion to believe that was Defendant's vehicle. Further, given the pair's history of selling drugs generally and specifically in Wyoming and Montana, the officers had reasonable suspicion to believe that they were transporting dangerous drugs and to conduct a traffic stop.

Accordingly, the drug investigation provided law enforcement with reasonable suspicion independent from the traffic violation to pull over Defendant. The stop did not violate Defendant's Fourth Amendment rights.

### 3.    *Traffic Violation*

Notwithstanding the Court's finding that the drug investigation provided a constitutional basis for the stop, the Court also concludes that Trooper Hudgins had

reasonable suspicion to effectuate the stop based on the obstructed temporary tag. Under Montana law, a person may not operate a vehicle without license plates that are "conspicuously displayed" and "obstructed from plain view." Mont. Code Ann. § 61-3-301(1)(a). If a person is operating a vehicle they just purchased and has not received the permanent license plate, they may use a temporary registration tag that is "properly displayed" on the vehicle. *Id.* § 61-3-317(1). "Conspicuously displayed" means that the plates are "obviously visible and firmly attached[.]" *Id.* § 61-3-301(4). "The terms 'obviously visible' and 'plain view' certainly contemplate a higher standard of visibility than that the plate merely be decipherable upon close inspection by an officer who has exited his vehicle and stands over the bumper." *Montana v. Haldane*, 300 P.3d 657, 665 (Mont. 2013).

Montana's license plate display statutes serve "an important purpose of enabling officers to ascertain if the vehicle is properly registered." *Id.* at 664. If plates are not conspicuously displayed, law enforcement officers cannot check a vehicle's registration. *Id.* Violation of these statutes can establish particularized suspicion for an officer to make a traffic stop. *Id.*

The Government asserts that the Court should defer to Trooper Hudgins's conclusion that the tag was obscured because he was "in the best position to determine how obscured the license plate was based on what he saw that day and at that time." (Doc. 48 at 20).

According to Defendant, the record demonstrates that the display of the temporary tag complied with Montana law.  Defendant first notes Agent Miller reported the temporary tag number prior to the stop.  (Doc. 51 at 3 (citing Doc. 49-1)).  He also points to the photo of the tag from the night of the stop, which shows that the tag is flat, legible, and well lit.  (*Id.* (citing Doc. 48-2)).  Further, Trooper Hudgins was able to call the plate in to dispatch before even exiting his vehicle.  (*Id.* (citing Doc. 50 at 18:06:40)).  Together, Defendant argues this evidence demonstrates that the tag complied with Montana law, and Trooper Hudgins's stop based on the traffic violation was pretextual.  (*Id.* at 3-4).

The Court agrees with the Government that Trooper Hudgins had reasonable suspicion to pull over Defendant based on the obstructed temporary tag because the tag was not obviously visible to either Agent Miller or Trooper Hudgins from a normal traveling distance.  Requiring law enforcement to employ additional measures to read a tag or plate number, as Defendant asks the Court to do, would interfere with the purpose of the statute: allowing law enforcement to ensure that vehicles are properly registered.  Further, the fact that the tag is visible in the photo attached to the Government's response is not relevant, since the statute requires a "higher standard of visibility" than an officer who is standing at the back of the vehicle being able to decipher the tag.  *Haldane*, 300 P.3d at 665.

Thus, Trooper Hudgins had reasonable suspicion to pull Defendant over based on the obstructed tag, and the stop did not violate the Fourth Amendment.

### B.    Arrest and Search of Defendant

The parties disagree on whether law enforcement had probable cause to arrest and subsequently search Defendant. Defendant argues that law enforcement was not justified in relying on Pedigo's information, and that their investigation did not provide sufficient additional evidence to amount to probable cause. (Doc. 45 at 11-16). The Government disagrees, asserting that Pedigo was a reliable informant, and that their investigation corroborated the information she gave. (Doc. 48 at 22-27). Together, Pedigo's information and the investigation provided officers with probable cause to arrest Defendant and to search him incident to his arrest, according to the Government. The Court will first address the reliability of Pedigo's tip, then whether the tip, law enforcement's investigation, and traffic stop combined, provided probable cause for the arrest and subsequent search of Defendant.

### 1.    Pedigo's Tip

Law enforcement may rely upon an informant's information as a basis for establishing probable cause. *Gates*, 462 U.S. at 238. When considering whether an informant's tip is sufficient to support a finding of probable cause, the Court "must employ a 'totality-of-the-circumstances approach' that takes into

18

consideration the informant's 'veracity' or 'reliability' and his 'basis of knowledge." *United States v. Rowland*, 464 F.3d 899, 907 (9th Cir. 2006) (quoting *Gates*, 462 U.S. at 238). In *Rowland*, the Ninth Circuit considered four factors bearing on the tip's reliability and veracity: (1) whether the informant is known, rather than anonymous; (2) whether the informant has a proven track record of reliability, as opposed to an unproven informant; (3) whether the informant reveals the basis for their knowledge; and (4) whether the tip provides "detailed predictive information about future events that is corroborated by police observation." *Id.* at 907-08.

Defendant concedes that the first and third factors are met but argues that the remaining factors substantially weigh against a finding of probable cause. (Doc. 45 at 10). The Government concedes that the informant did not have a proven track record of reliability, but that the remaining factors are met and weigh in favor of probable cause. (Doc. 48 at 25-26).

The Court finds that the first and third factors weigh in favor of reliability, and the second and fourth weigh against reliability. Pedigo was not anonymous and provided the basis for her knowledge. However, Pedigo was not a proven informant and did not provide *predictive* information about, for instance, a future drug deal. The Court acknowledges, though, that Pedigo provided detailed information to officers about past conduct that officers then corroborated with law

enforcement and open-source databases and by reading Pedigo's texts with
Defendant.

Accordingly, the Court finds that the balance of the *Rowland* factors weighs
against the reliability of Pedigo's tip, and therefore officers could not exclusively
rely on her tip to arrest Defendant.

### 2.   Totality of the Circumstances

As stated, the Court must look to the totality of the circumstances in
evaluating whether probable cause exists. Here, Pedigo's tip cannot be looked at
in isolation, and thus is not determinative of the issue, because her tip served as the
catalyst for a month-and-a-half long drug investigation that both corroborated
Pedigo's statements and unearthed new information about Defendant's conduct.
The investigation into Gutierrez provided additional information into Defendant's
conduct, as did the traffic stop. Thus, the Court cannot confine its analysis of
probable cause to the Pedigo's reliability and the officers' corroboration of
Pedigo's information, and will consider the tip, its corroboration, the subsequent
investigations, and the traffic stop in their totality.

In considering the totality of information known to officers at the time of
Defendant's arrest, the Court finds probable cause existed. As described, officers
had learned and corroborated that Defendant supplied dangerous drugs to Pedigo,
that he had a past drug distribution conviction, and that he had previously traveled

from Colorado to Wyoming and Montana with Gutierrez, who officers had

independently learned trafficked drugs. Officers also knew that Defendant drove a

Kia SUV and that, on the day of the instant incident, he was with Gutierrez in

Wyoming but not in Gutierrez's Equinox, which the tracker traced to Aurora.

Knowing these facts, there was a fair probability that Defendant was in the Kia

seen by Agent Miller, and that they were traveling to Montana to distribute drugs.

    Defendant's arguments about the insufficiency of the investigation disregard

the significance of the connection officers discovered between Gutierrez and

Defendant. Contrary to Defendant's contention that Hanson and Johannesen

provided "minimal information," they connected her to drug distribution and to the

Equinox that Defendant was later seen with in Billings. (Doc. 45 at 15). Officers

then learned Gutierrez frequently stayed at the La Quinta Inn in Casper, where she

sold Hanson and Johannesen drugs, further indicating that she, like Defendant, was

involved in drug distribution. The fact that Gutierrez's and Defendant's

movements then synced allowed officers to connect the dots between the two and

conclude that there was a fair probability they were working together in

distributing drugs.

    The traffic stop further supported the officers' probable cause. First, it

corroborated the investigation's finding that Gutierrez and Defendant travel

together from Colorado, through Wyoming, and to Montana. Second, though

Defendant initially was polite and cooperative, he refused to exit the vehicle when commanded to and obstructed Agent Stewart's attempt to remove him. Regardless of his participation in the vehicle flight itself, Defendant demonstrated a clear disinterest in complying with police orders when he knew he was the subject of a drug investigation.

Because law enforcement had probable cause to arrest Defendant based on the drug investigation, they also were authorized to search his person. *Chimel*, 395 U.S. at 762-63. Thus, neither the arrest nor the search violated the Fourth Amendment. Given these findings, the Court will not address the Government's argument that the car chase gave law enforcement independent probable cause to arrest and search Defendant.

## IV.    Conclusion

For these reasons, the Court finds law enforcement did not violate Defendant's Fourth Amendment rights. IT IS HEREBY ORDERED that Defendant Michael Joseph Owens's Motion to Suppress (Doc. 44) is DENIED.

DATED this 8th day of August, 2023.

SUSAN P. WATTERS
United States District Judge

22